[Cite as *Am. Trim, L.L.C. v. L&T Technologies, Inc.*, 2014-Ohio-1879.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## AUGLAIZE COUNTY

AMERICAN TRIM, LLC,

    PLAINTIFF-APPELLEE,                     CASE NO. 2-13-25

    v.

L & T TECHNOLOGIES, INC., ET AL.,        O P I N I O N

    DEFENDANTS-APPELLANTS.

---

**Appeal from Auglaize County Common Pleas Court**
**Trial Court No. 2011 CV 0185**

**Judgment Affirmed in Part, Reversed in Part and Cause Remanded**

**Date of Decision: May 5, 2014**

---

APPEARANCES:

    *Richard E. Siferd* **for Appellant**

    *Lawrence A. Huffman* **for Appellee**

Case No. 2-13-25

**ROGERS, J.**

{¶1} Defendants-Appellants, L&T Technologies, Inc. ("L&T") and Thomas Belmont, appeal the judgment of the Court of Common Pleas of Auglaize County awarding Plaintiff-Appellee, American Trim, LLC ("American Trim"), a monetary award. On appeal, L&T and Belmont argue that the court committed the following errors: (1) finding that American Trim expressly rejected goods by notifying L&T as required by the Uniform Commercial Code ("UCC"); and (2) finding that Belmont had engaged in fraud. For the reasons that follow, we affirm in part and reverse in part the trial court's judgment.

{¶2} On July 11, 2011, American Trim filed a complaint ("Original Complaint") against L&T seeking damages stemming from the sale and delivery of a defective Electro-Deionization Nickel Recovery Unit ("EDI Unit"), which it alleged breached the parties' contract. On November 28, 2011,[1] L&T filed its answer ("Original Answer") in which it denied the allegations set forth in American Trim's complaint and asserted four specific defenses: (1) American Trim failed to mitigate damages; (2) American Trim's complaint failed to state a claim upon which relief can be granted; (3) insufficient service of process; and (4) lack of jurisdiction over L&T. On November 30, 2011, L&T filed an amended answer ("Amended Answer") and asserted two additional defenses: (1) American

---

[1] We note that L&T filed its Original and Amended Answer outside the period set forth in the Ohio Rules of Civil Procedure; however, both parties stipulated that L&T's Answer was timely filed. *See* (Docket No. 16, p. 1).

Trim failed to allow L&T to cure the alleged non-conforming tender; and (2) American Trim did not make an effective rejection of the goods.

{¶3} The discovery in this matter was quite contentious. American Trim filed its first notice to take Belmont's deposition on July 25, 2012. (Docket No. 22, p. 1). According to American Trim, this was a date that was suggested by L&T and accepted by American Trim. However, Belmont asked, one week before the scheduled deposition, to change the date. American Trim rescheduled the deposition to August 21, 2012, but Belmont once again cancelled. American Trim then filed its third notice to take Belmont's Deposition on October 8, 2012. On September 17, 2012, American Trim filed a Motion to Compel, and moved the court to compel Belmont's attendance at the October 8 deposition and to also compel L&T to answer interrogatories that were served on L&T "on or about July 10, 2012[.]" (Docket No. 25, p. 1).

{¶4} L&T filed its response to American Trim's Motion to Compel and asked the court to deny the motion requiring Belmont's attendance at the October 8, 2012 deposition because he would be "out of the country on that date." (Docket No. 26, p. 1). Further, L&T claimed that it offered to take Belmont's deposition on September 9, 2012 by telephone or others means, which was refused by American Trim. L&T explained that Belmont was reluctant to come to Lima, Ohio for his deposition because he "does not fly since 9/11 as he was scheduled,

but missed, a flight which subsequently flew into one of the [World Trade Center] Towers." (*Id.* at p. 1-2). L&T suggested that Belmont's deposition be taken on October 15, 2012 via video conference.

{¶5} On September 21, 2012, the court issued its judgment entry and ordered L&T to answer American Trim's interrogatories by September 28, 2012 and also ordered that Belmont appear at the October 8, 2012 deposition in Lima, Ohio.

{¶6} On October 11, 2012, American Trim filed a Motion for Sanctions. The motion alleged that Belmont did not appear at the October 8, 2012 deposition.[2] On October 23, 2012, L&T filed its Response to Motion to Compel and Objection to Order of Court asserting that Belmont is not a party to the matter and thus may only be compelled to testify at a deposition by the use of a subpoena pursuant to Civ.R. 30.

{¶7} On October 25, 2012, American Trim filed a Motion to Withdraw Motion for Sanctions and also filed a Motion to Amend its Complaint, which the trial court granted on October 26, 2012. On November 1, 2012, American Trim filed its first amended complaint ("Amended Complaint") which added Belmont as a defendant and also added a claim of fraud against Belmont. In its Amended Complaint, American Trim alleged that it had "purchased the [ED45 Unit] on the

---

[2] The reason for Belmont's absence from the deposition was not that he was out of the country, as L&T conveyed to the trial court in its Response to Motion to Compel. Instead, Belmont was advised by his cardiologist on October 4, 2012, that he should not travel to Ohio for his court ordered deposition.

representation of Defendant Thomas V. Belmont, Sr. that his company was proficient in producing the nickel recovery system which he designed and installed." (Docket No. 52, p. 3). American Trim also alleged that in the course of discovery, it was made aware that Belmont had no experience building ED45 Units.

**{¶8}** On November 21, 2012, L&T filed a motion for a more definite statement claiming that American Trim did not plead with particularity its claim for fraud, as required by the Ohio Rules of Civil Procedure. That same day, L&T filed its amended answer to American Trim's Amended Complaint ("Second Amended Answer") wherein it asserted one additional defense: L&T "only warranted the system to perform removal of nickel in the concentrations found in the sample. The warranty excluded impliedly and/or expressly removal of nickel in other concentrations." (Docket No. 55, p. 2). On November 26, 2012, the trial court denied L&T's motion for a more definite statement, stating that their motion was moot as it had already filed its Second Amended Answer.

**{¶9}** On February 6, 2012, L&T filed a motion to dismiss for failure to state a claim.[3] L&T argued that, because fraud must be pleaded with particularity, American Trim "is required to plead 'specific statements claimed to be false' and the time and place they were made." (Docket No. 73, p. 4). On February 12,

---

[3] L&T filed a second motion to dismiss on May 17, 2013, alleging that American Trim did not properly sign its interrogatories. Therefore, L&T argued that American Trim should be precluded from introducing evidence of fraud. On May 28, 2013, the trial court denied L&T's motion.

2013, the trial court denied L&T's motion to dismiss, finding that the Amended Complaint was sufficient to allege fraud.

{¶10} L&T served American Trim with interrogatories on February 19, 2013. These interrogatories asked what specific statements Belmont made, which American Trim claimed to be false. However, at this point in time, Belmont's deposition still had not been taken. It was not until March 28, 2013, when Belmont was finally deposed.

{¶11} L&T filed its own Motion to Compel on April 26, 2013, claiming that the interrogatories it served on American Trim had not yet been answered. That same day, the trial court ordered American Trim to answer the interrogatories within seven days. It appears from the record, that American Trim answered L&T's interrogatories on May 3, 2013. This matter was originally scheduled for trial on May 7, 2013.

{¶12} The interrogatories detailed five specific statements Belmont made, which American Trim alleged were fraudulent. Two statements were made after American Trim and L&T entered into a contract. The other three statements American Trim alleged were fraudulent were made in L&T's written proposal. These three statements were:

[1] The most cost effective and efficient system that meets the water quality for R1 water recycle and nickel concentration for reclaim back to process, is electro dialysis through an LTED-40[4] System.

[2] A complete operation and maintenance manuals [sic] will be provided on CD and the manual shall include but not be limited to, installing, detail schematics, Manufacturer's literature, sequence of operations and of the complete LTED Tech Inc. system catered to the custom design of the system.

[3] LT Technologies, Inc., a global firm is uniquely qualified in the marketplace as a design build firm, by offering a total dedicated engineering and manufacturing dynamic to each project we undertake. By employing this dedicated approach, LT technologies consistently meets or exceeds budget and timeline goals, which in turn, ensures our clients meet their responsibilities for compliance and /or production. The Core strategy of design build is what stands LT apart from firms that do either engineering, or experimental design analysis, as well as real time data gathering being turned into production improvements. The result is a robust, industrial grade system with the people and the firm to stand behind it. Superior quality is not our goal it is our standard.

(Docket No. 140, Exhibit A, p. 2).

{¶13} On May 7, 2013, L&T moved for a continuance arguing that it was unable to defend the fraud claim because American Trim's answers to L&T's interrogatories raised completely new allegations of fraud that were not raised in its Amended Complaint. The court granted L&T's motion for a continuance based upon the failure of American Trim to timely provide discovery.

---

[4] The number "40" was a typographical error and it should have read "an LTED-45" system. However, there is no difference between an LTED-40 or an LTED-45 system because "it's a made-up number. [L&T has] never built one, so we just made that number up." Belmont Dep., p. 61-62.

{¶14} On July 12, 2013, a bench trial was held in this matter. The following relevant evidence was adduced at trial.

{¶15} Aaron Art, a plant engineer at American Trim, was the first witness to testify. Art testified that American Trim makes burner bowls and decorative chrome pieces for the appliance industry. Art explained how American Trim makes these burner bowls and chrome pieces:

> We actually start with the raw coil and we'll actually stamp and draw the parts out in our plant, move them down to another process which we nickel chrome plate them. Nickel is put on as a base coating on the steel to make it more shiny and then chrome is put on top of that. So as the parts are processed through the plater they go through multiple cleaners, then the nickel tanks and then a chrome tank. And between the nickel and chrome are multiple rinses. And after the nickel process, we have hems in the parts, we have residue on the parts, and after we go through the nickel process, we rinse those parts and that's where all that nickel builds up, in those rinse tanks.
>
> * * *
>
> That residue that's rinsed off is very high latent in liquid nickel which is a little confusing, because we actually put nickel chips in the tank, but it changes the state into a liquid and it's not a heated liquid, it's just dissolved. So this nickel builds up in our rinses and to be cost competitive and compete with China, you know, for years we've recycled this nickel back into our process. Nickel varies anywhere from six to twenty-four dollars a pound, it's a very high commodity item and moves and fluctuates.

Trial Tr., p. 17-18.

{¶16} Art testified that recycling the nickel is very important to American Trim since it keeps costs down and makes the company competitive. Not only

does recycling the nickel allow American Trim to buy less nickel, it also lowers the cost when it treats its wastewater. In order to recycle its nickel, American Trim has been using an eco-tech nickel recovery system ("Eco-Tech Unit"). The Eco-Tech Unit was more than 20 years old and began to act inconsistently in its removal of nickel.

{¶17} Art explained how the Eco-Tech Unit worked:

A: It is not really an evaporation. What it does is it uses acid to activate a resin and the resin, as the nickel solution goes through it, concentrates the nickel and you have almost water come out. In other words, there's very, very, very little nickel in that water.

Trial Court: So it coagulates?

A: It coagulates actually in the resin. So then you use the acid to regenerate this resin and when you flush that resin out, that's when you get your concentrated nickel back.

Trial Court: You coagulate the nickel down with the resin then wash the resin with the acid and end up with just the, -

A: It rejuvenates the resin ready for more nickel to be recovered. It's kind of like a water softener on acid. I mean, it works in that concept.

*Id.* at p. 19-20. Art testified that Eco-Tech systems are popular and still in use.

{¶18} Around January of 2010, American Trim decided that it needed to replace the Echo-Tech Unit because it was not recovering as much nickel as it wanted. Art testified that he spoke with Eric Todd, who worked for Electrix, a company that builds, installs, and removes plating systems, to see if he had any new or used Eco-Tech systems. Todd told Art that he knew of a fairly new, but

used, Eco-Tech system owned by L&T.  Todd referred Belmont to Art, and the two began communicating about L&T's used Eco-Tech system.

**{¶19}** Art stated that Belmont "recommended that he could come in, look at the whole process, look at our existing machinery, have the waste analyzed, the wastewater, so he could know how much savings was there, and look at what he could do to help us recycle that."  *Id*. at p. 23.  American Trim and L&T entered into an agreement wherein L&T was to complete an engineering study and "supply preliminary Nickel Recovery System quotations and schematics of the treatment alternatives along with anticipated area, and power consumption required for a complete system."  (Docket No. 140, Exhibit 1, p. 2).

**{¶20}** Belmont came to American Trim in late February of 2010.  Belmont met with Dan Motter, who is the plating manager who has 30 plus years of experience at American Trim.  After Belmont left American Trim, he emailed Art stating that Belmont needed more samples of the wastewater, which Art sent to him.  Belmont told Art that getting samples were "critical to make sure that [L&T] siz[ed] the unit right."  Trial Tr., p. 27.  Art testified that Belmont could not believe how high the nickel readings were in the wastewater and that he eventually came "to the realization that that is really how much nickel needs recovered."  *Id.* Belmont stated, in an email dated March 9, 2010, that "we are going to look at 2 or 3 technologies that would be applicable for this application.  One that may work

better than the resin based system is EDI or Electro Deionization ion exchange/which [sic] is a membrane based system that has very good success on watts nickel based baths as well as sulfamate." (Docket No. 140, Exhibit 3, p. 1). Belmont then asked Art to send a 5 gallon container of the wastewater so L&T could run a "bench scale pilot test in order to size up the proper system design." (*Id.*).

**{¶21}** Art testified in "verbal discussions" with Belmont, Belmont "basically expressed that he was very familiar with the resin base as well as the reverse osmosis. He's done desalinization of water so there's a lot of water purification he's been involved with." Trial Tr., p. 31.

**{¶22}** After Art sent Belmont the five gallon jug sample, Belmont indicated that the pilot test was "very successful and that he was going to go ahead and quote the electro-dialysis machine." *Id.* at p. 33. However, American Trim was never provided with the lab results before litigation was initiated. When the lab results were provided in the course of discovery, it did not show the results of the pilot test. *See* (Docket No. 140, Exhibit 7, p. 1).

**{¶23}** In March of 2010, Belmont recommended to Art that American Trim purchase the EDI Unit, instead of L&T's used Eco-Tech Unit. Art was able to explain how the EDI Unit differs from the Eco-Tech Unit:

> The EDI System uses membranes and has positively and negatively charged fields as you go through the membrane. So it's literally like

electro-dialysis, if you would, for your kidney or something. They're using fields of electrons on each side. So as it passes through the membranes, the nickel concentration should be going out one (1) membrane and the water out another one as it's passing through. So the membrane is like a thirty by thirty (30 x 30) inch box of the total unit.

*Id*. at p. 38.

{¶24} On May 28, 2010, American Trim decided to purchase the EDI Unit and entered into a contract with L&T to build the EDI Unit for $104,500. According to the contract, 40% of the payment was due upon placement of the order; 40% was due seven days prior to delivery; and the final 10% was due upon the completion of installation and start-up.

{¶25} Art testified that Belmont told him that the EDI Unit would recover 1.87 to 2.47 pounds of nickel per hour and that assurance was outlined in the written proposal. Trial Tr., p. 59; (Docket No. 140, Exhibit 2, p. 1-2). The written proposal specified that American Trim would see a return on its investment. L&T stated that American Trim, with its old Eco-Tech Unit, hauled off 6,000 pounds of nickel last year, which they would save with the new EDI Unit, thus, saving the company $78,000 a year. *See* (Docket No. 140, Exhibit 2, p. 2); Trial Tr., p. 56-57. Further, the contract stated that after the installation of the EDI Unit, American Trim would save an additional $9,000 by purifying the wastewater. *Id*.

{¶26} The EDI Unit was delivered to American Trim in November of 2010. Per the contract, Bill Sardo, an employee of L&T, was supposed to visit American

Trim to train its employees and help with the start-up of the EDI Unit. However, Sardo was unable to come to American Trim until January of 2011.

{¶27} Art testified that Sardo had trouble getting the EDI Unit to start. Initially, Sardo was only scheduled to be at American Trim for two days. However, on the first day, when Sardo tried to start the machine, the motor burnt out and he had to wait a day and a half for L&T to ship another motor. There were other equipment problems that delayed starting the EDI Unit and delayed the training of American Trim's employees on how to operate the EDI Unit. As a result, Sardo decided to stay one day longer than planned. Art was under the impression that Sardo would schedule another visit to complete the training; however, Sardo never returned to American Trim after his initial visit.

{¶28} When Sardo began the startup, he recommended running the machine around 20 volts and then gradually ramping it up, a week at a time, until it would eventually run on 80 volts. Art also testified that Sardo brought an operation manual with him, but the "operation manual wasn't even related to the [EDI Unit]. It was very generic, it was more of a [manual for] wastewater or an R-O system." *Id.* at p. 43. Sardo had to contact Dan Bailey, an engineer at Mech-Chem who performed the application and engineering of the membrane cell in the EDI Unit, for the operation manual for the cell. Art testified that Bailey's operation manual was much more helpful and informative than L&T's.

{¶29} Art testified that after the machine was up and running, American Trim created a spreadsheet, checking different concentrations and recording how much nickel it was recovering. These spreadsheets were sent to Belmont and Bailey. Art would have conference calls to discuss the data with Belmont and Bailey because the data revealed that the recovery of nickel was much lower than everyone had anticipated. Instead of recovering 1.87 to 2.47 pounds of nickel per hour, like Belmont had promised in his proposal, the EDI Unit was only recovering 1/3 to 1/2 of a pound of nickel per hour. Art testified that American Trim runs its plants 24 hours a day, five to six days a week, thus, these low levels of recovery were very troubling for American Trim. Further, American Trim was unable to recycle water, because there was too much nickel in the water. Bailey confirmed that the most nickel the EDI Unit would recover was between 1/3 to 1/2 a pound of nickel per hour.

{¶30} On January 28, 2011, Art sent Belmont an email stating:

I NEED A PLAN! What can be done to get this unit to perform, to quote and [sic] savings justification we used?

There is more and more discussion happening about sending it back! Our plant manager is tanking [sic] this up the ladder to our president today!

What resolutions or offers can you make! Are we better sending it back?

(Emphasis sic.) (Docket No. 140, Exhibit 8, p. 1). Belmont responded to Art's email that same day, stating that his solution would be to add "2 more 45 cell pair stacks" to the EDI Unit. *Id.* Further, Belmont stated:

> Please remember that our proposal was based on the small amount of data at that time and things have changed. We have a warranty for parts and materials there was no implied performance warranties in our proposal the items called out in the proposal were general estimated parameters. We wish to work with you and your company in developing a more workable process but we also need for there to be an amicable solution with give and take being mutual.

*Id.* On February 9, 2011, Belmont stated that the two extra cells would cost American Trim an additional $145,000 and would "allow [American Trim] to recovery [sic] the majority of all your nickel dragout." (Docket No. 140, Exhibit 5, p. 1); Trial Tr., p. 50.

{¶31} Art stated that Belmont's January 28th email was the first time he heard Belmont state that the EDI Unit was not warranted to work. Art also explained that if American Trim added two additional cells the entire EDI Unit would have to be remounted and reskidded. Art testified that he had relied on Belmont's representations in the proposal that the EDI Unit would work and recycle nickel close to the amounts that were quoted in their contract. Between January and March 2011, there were numerous conference calls between American Trim and L&T. Art testified that he asked Belmont for American Trim's money back during these phone calls. Art also stated:

Q: Did he ever give you any indication that he would ever give you any money back?

A: No. We were, - there was quite a few of us, there was three (3) or four (4) of us involved in most of the conference calls and what was so frustrating was in the conference calls was is [sic] we were more worried about the machine not performing than they were. It was almost a headache because we wanted to have a conference call again about it and what was very frustrating was is [sic] we were literally bending over backwards trying to make this machine work and that's not what we felt we were getting from them.

 * * *

Q: Is there any question in your mind that Mr. Belmont knew that you weren't satisfied with the machine and you wanted to give it back to him and you wanted your money back?

A: He definitely knew. I mean, we tried to get Bill Sardo back to make it work and he wouldn't even offer sending him back.

Q: He wouldn't send him back?

A: No.

Q: But is there any doubt in your mind that you made it clear to Mr. Belmont that you wanted your money back and he could have his machine back?

A: Yes.

Q: You believe you made that clear to him?

A: Yes.

Trial Tr., p. 81-82.

{¶32} American Trim had to stop using the EDI Unit in early March 2011, and was forced to use its old Eco-Tech Unit. Since Belmont would not refund any portion of the purchase price of EDI Unit, American Trim decided to keep the EDI

Unit as collateral until a resolution could be sorted out. At the time of trial, the EDI Unit was sitting in storage in one of American Trim's plants, and it has not made any attempt to try to sell the parts. Art testified that American Trim would have no problem sending the EDI Unit back to L&T in its entirety.

{¶33} On cross-examination, Art admitted that Todd had recommended Belmont. Art stated that the electro-dialysis is a newer technology, but has been around for 20 plus years. Art also had the following relevant exchange:

> Q: Now, is it a fair statement that the quote was actually more or less a collaborative effort? I mean, you told [Belmont] what you needed in the quote, didn't you?
>
> A: Basically Tom asked me what savings areas there would be and I did not give him the actual data, he helped figure that out.
>
> * * *
>
> Q: Alright. And so you talked to him about what some of the things you needed in the quote to help justify it. Is that a fair statement?
>
> A: That is true.
>
> Q: And so, for example, the cost savings for nickel, things like that. These are things that you wanted in the quote?
>
> A: Correct.

*Id*. at p. 86-87.

{¶34} Art stated he learned, for the first time, that L&T bought the membrane cell from Mech-Chem when Sardo came to set up the EDI Unit. Art also testified that American Trim was unsatisfied with the solutions that L&T

proposed to fix the EDI Unit. Art stated that he did not find that L&T's solutions were credible. Art explained:

> A: Well, one of his proposals he has is he wanted us to have a dry R-1 tank, which I cannot have a dry tank there or else I literally get what they call "dry down" on the parts. It would be, --
>
> Q: And that effects [sic] the quality of the parts?
>
> A: --, permanent streaking and every part will be bad. The other proposal he wanted us to do was take the R-1 tank, feed it to a reverse osmosis system, super concentrate the nickel, then feed it to the EDI cell to be re-concentrated. So four (4) spaced skid plates, skid spot, plumbing, there was quite an elaborate thing needed there.

*Id*. at 101. Art testified, that in his opinion, Belmont was offering these solutions because "he was grasping at straws." *Id*. at p. 102.

{¶35} Dan Motter was the next witness to testify for American Trim. Motter is the plating manager and is responsible for the plating departments and keeping all of American Trim's machines running. Motter testified that he helped Art pick out a new nickel-recovery unit for American Trim. Motter also confirmed that Belmont visited American Trim in February of 2010.

{¶36} Motter testified that he gave Belmont samples of American Trim's wastewater after it came out of the plating line, but before it went through the Eco-Tech Unit. When asked whether Belmont made any representations to Motter, Motter replied:

> A: Basically it was just a, - to us, it was a different type of recovery system that he felt pretty confident that it would meet our needs.

-18-

> Q: Well, I'm talking about in the first meeting, in February of 2010, what did he say about his company, about what experience they had with wastewater, recovery, etcetera.
>
> A: Different experiences with different precious metals. That was about it really.

*Id*. at p. 109.

{¶37} When Sardo arrived in January of 2011 to help install the new EDI Unit, Motter testified that Sardo stated that the EDI Unit was a "beta unit" and that "he would not really use it on nickel recovery." *Id*. at p. 110. Motter explained what he meant by "beta unit":

> A: A trial, first time using it for this type of thing.
>
> Q: Did he say, - did Bill Sardo say anything at that time, you mentioned a minute ago, "the first time we've done this with nickel recovery".
>
> A: Umm hum.
>
> Q: Tell me and tell the Court, best you can exactly what you remember Bill Sardo saying in January of 2011.
>
> A: Just pretty much that he'd not ever used it as a nickel recovery system before.

*Id*. at p. 110-111.

{¶38} Motter testified that American Trim had its new Eco-Tech Unit installed in January or February of 2012 and that from May of 2011 to early 2012, American Trim had to use its old Eco-Tech Unit. Motter stated that the new Eco-Tech Unit recovers almost 100% of the nickel drag out. With the old Eco-Tech

Unit, Motter estimated that American Trim was recovering 75%, whereas the EDI Unit would only recover about 30%.

{¶39} After Motter's testimony, American Trim and L&T stipulated that the trial court admit the deposition of Belmont into evidence.

{¶40} At his deposition, Belmont testified that L&T was started in 1990. Before then, Belmont was involved in a similar business named Wastewater Systems Engineering. Belmont stated that the majority shareholder of L&T is his wife, owning 60% of the stock in L&T. Belmont testified that he owns 40% of the stock. Belmont's son, Thomas M. Belmont, also works for L&T, but does not own any shares.

{¶41} Belmont testified that he is a chemical engineer. He stated that he first came into contact with American Trim through a company called Electrix. Belmont explained that a representative from Electrix had mentioned that American Trim was having wastewater difficulties. Belmont was given American Trim's contact information and subsequently called American Trim.

{¶42} After Belmont initiated contact with American Trim, they discussed American Trim's wastewater needs and came to the agreement that Belmont would come to Wapakoneta, Ohio for an "engineering evaluation[.]" Belmont Dep., p. 12. Belmont visited American Trim in February of 2010. During his visit, Belmont stated he met with Motter. Belmont described his visit:

Q: Okay. And how long were you down there?

A: Probably about an hour or so.

Q: One hour?

A: Yeah, an hour.

Q: Okay. Tell me what all you did while you were there in Wapak in talking with Dan Motter. What did you see, look at, et cetera?

A: Well, when we first came in, we sat in the conference room, we took out our brochures of what we do.

Q: Um-hum.

A: And then we looked at those items. After that they proceeded in, showed me their wastewater treatment area.

Q: Um-hum.

A: Showed me the old Eco-Tech system they needed to do something with, either replace or repair.

*Id*. at p. 20.

**{¶43}** Belmont testified that he never gathered wastewater samples at American Trim, but small samples were later mailed to L&T. When Belmont returned to Massachusetts, he contact Bailey, and they discussed whether an EDI Unit would be appropriate for American Trim. Concerning their conversation, Belmont testified:

A: I described to [Bailey] the operation at American Trim.

Q: Okay.

A: And that it's a lot of nickel, they have a lot of nickel drag-out because of the types of parts they do.

Q: Right.

A: And so I asked him, what do you think about the EDI process that you people have?

Q: Um-hum.

A: Would it work? He says, yeah, it's an excellent way to do it, he said; because, he said, we have them at General Electric, Westinghouse, places like that who use them. And he said, you just, the higher the concentration, he said, the faster it works.

*Id*. at p. 30.

**{¶44}** In late February, early March 2010, Belmont recommended to Art that they go forward with the EDI system instead of the Eco-Tech system. Belmont also testified that he told American Trim that it could expect to recover more nickel with the EDI Unit and that the EDI Unit would be the more efficient than an Eco-Tech system. *Id*. at p. 28.

**{¶45}** Belmont testified that when he learned that the EDI Unit did not work, he proposed a solution in late February, which would cost American Trim an extra $145,000. L&T also offered another solution in July of 2011, which L&T would manufacture and install, at its own costs.

**{¶46}** Belmont testified that American Trim has not paid the full purchase price and has only paid $98,500. Belmont conceded that the EDI Unit did not perform the way American Trim expected it would. Belmont then had the following relevant exchange:

Q: * * * Why shouldn't [American Trim] get their 98,950 whatever it was that they paid you for this system if it doesn't do what they expected it would do?

A: Well, we were not allowed to remedy the situation the way we normally would.

Q: You were not allowed to remedy the situation.

A: Remedy the situation, yes. I mean, we gave them a proposal to expand the system.

Q: That was the proposal that would have cost them - -

A: Right, yeah, we looked at that. That was open to discussion. We never got a call back on it. I mean, there was no - -

Q: But that one involved them paying another $145,000, didn't it?

A: Or less.

*Id*. at p. 95-96.

{¶47} Regarding his brochures and advertising, Belmont stated:

Q: Okay. In that initial conference with Dan Motter and you had your brochures out, I read some of your brochures talked about your company being the leading [sic] in this type of process.

A: Yes, I know. That's kind of, that's my son's language. It's more on our website.

Q: Are you saying it's puffery? I'm sorry, that's a legal term. * * *

A: Well, it's, you know, like all companies do, you know.

* * *

Q: Well, now that you mention that, I mean, isn't that why that's in there is to encourage people to buy from you?

A: Of course.

Q: All right. Well, I appreciate that, and that's part of my question is your, you felt comfortable making that statement in there because of machines you had built in the past and projects you had worked on in the past.

A: Right.

*Id.* at p. 65, 67.

**{¶48}** Belmont's experience was also discussed in greater detail. When asked whether Belmont was familiar with American Trim's old Eco-Tech Unit, Belmont replied, "[s]omewhat, yeah. I wasn't an expert on it, but I somewhat knew about it." *Id.* at p. 21. Belmont testified that he has built other types of recovery systems.

Q: All right. Okay. Had you before designed and installed a reverse osmosis system before?

A: A R.O., yes. Yes, we have.

Q: Okay. How many R.O.s prior to January of 2011 had you designed and installed?

A: Not on nickel recovery but on many other things.

Q: Okay. Like what?

A: We do a lot of R.O. desalination.

Q: Desalination? Okay.

A: Desalination. City water, clean up what they need.

Q: Okay.

A: High purity water systems.

* * *

Q: And the iron exchange system, how many of those had you done before then?

A: Oh, many, many.

Q: Okay. Had you ever designed any kind of system that was designed to remove nickel from wastewater before this one?

A: Yes, yeah.

Q: Okay. When was that?

A: 10, 12 years ago.

*Id*. at p. 88, 90-91.

{¶49} In regard to the EDI systems, Belmont testified that he has known about the EDI process for a "few years." *Id*. at p. 24. He stated that EDI Units are "commonly used in a lot of plating shops." *Id*. However, when asked in what shops he has seen a working EDI Unit, he could not name one and stated that "[u]nfortunately, a lot of them are out of business right now." *Id*. Belmont admitted that he has only built one EDI Unit in his lifetime, which was the unit he built for American Trim. Belmont also testified that it was his belief that an EDI Unit was capable of recovering 1.87 to 2.43 pounds of nickel per hour. He based that belief on Bailey's advice and on the "data that Aaron Art sent[.]" *Id*. at p. 50. Belmont denied ever representing to American Trim that he was proficient in producing nickel recovery systems. However, Belmont never disclosed to American Trim that he had never built a nickel recovery system before.

Q: Okay. In any of that discussion with Dan Motter or Aaron Art, did you ever tell them, I've never made one of these before, yours will be the first?

A: I don't know if I did or not. I mean…

Q: Okay.

A: I may have.

Q: You wouldn't be surprised if they both say we didn't know this was the first one he built? You wouldn't be surprised if they said that, right?

A: No.

*Id*. at p. 67-68.

{¶50} At the close of American Trim's evidence, L&T moved to dismiss the fraud claim against Belmont pursuant to Civ.R. 41(B)(2). At this time, the trial court and American Trim's counsel had the following relevant exchange:

Trial Court: Now the rest of the stuff about global world leader, blah, blah, blah, isn't that just permitted puffery?

A: I wouldn't, - the answer, -

Trial Court: I mean, you understand the difference between, -

A: I do.

Trial Court: --, a specific representation and, "Oh, I'm the best"?

A: I do, and you're absolutely right, Your Honor.

Trial Court: Okay. * * * [W]here specifically is there a specific representation that they have done nickel recovery before?

A: Him verbally. There is evidence in the record where he's verbally represented to him he's done nickel recovery before and he said that in his deposition. But there is evidence that before May of

-26-

2010, he says "I've done a lot of these nickel recovery events." That testimony came from Aaron Art.

\* \* \*

Trial Court: Okay, I need to know specifically, what was the specific misrepresentation that was relied upon?

A: Specific misrepresentation that was relied upon is one, "I know how to build nickel recovery units." Two, "This EDI Unit will recover nickel for you of one point eight seven (1.87) to two point four three (2.43) pounds per hour." \* \* \* [I]n [Belmont's] testimony he admits, "Well, yeah, Dan Bailey said it'll get one-third to half a pound per hour." And that's off of the, - what was known, what was represented to them it could recover.

Trial Court: \* \* \* I don't remember a specific question about [Belmont] telling [American Trim] that he had done nickel recovery before. What page is that?

A: In the deposition?

Trial Court: Yes, sir.

A: I don't remember it in the deposition, it's in those e-mails though. I think it's in the emails and I do remember, -

Trial Court: I'm sorry, you just argued that, "and he said so in his deposition."

\* \* \*

A: I think if you review the record and testimony from Aaron Art, you will hear from Aaron Art that Tom Belmont said, "I've done nickel recovery systems."

*Id*. at p. 135-138.

{¶51} The trial court declined to render any judgment until the close of all the evidence. L&T offered American Trim's answers to its interrogatories as its first and only exhibit and then rested.

{¶52} On August 29, 2013, the trial court issued its judgment entry, finding that American Trim properly rejected the EDI Unit and that Belmont had engaged in fraud. The trial court also found that L&T and Belmont were jointly and severally liable for $98,500, the purchase price of the EDI Unit.

{¶53} L&T and Belmont filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**AS THERE IS NO EVIDENCE IN THE RECORD THAT AMERICAN TRIM EXPRESSLY REJECTED THE GOODS BY NOTIFYING L&T TECHNOLOGIES AS REQUIRED BY THE UNIFORM COMMERCIAL CODE, A FINDING OF SUCH REJECTION BY THE TRIAL COURT IS ERROR AS A MATTER OF LAW.**

*Assignment of Error No. II*

**FRAUD BY THOMAS BELMONT WAS NOT ESTABLISHED AS A MATTER OF LAW.**

*Assignment of Error No. I*

{¶54} In their first assignment of error, L&T and Belmont argue that the trial court erred in finding that American Trim properly rejected the EDI Unit as there is no evidence in the record that American Trim notified L&T that it was rejecting the EDI Unit. We disagree.

Case No. 2-13-25

*Standard of Review*

{¶55} Contrary to L&T's and Belmont's request that this court conduct a do novo review of the evidence, "an appellate court is not permitted to reverse a trial court's judgment when it is supported by competent, credible evidence going to all the essential elements of the case."[5] *Huntington Natl. Bank v. Findlay Machine & Tool, Inc.*, 3d Dist. Hancock No. 5-11-27, 2012-Ohio-748, ¶ 29, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978). Further, it is well established that when a trial court's decision involving R.C. 1302.01 et seq. is based on competent, credible evidence, the reviewing court may not reverse it on appeal. *Findlay Machine & Tool*, ¶ 29; *Builder's Kitchens of Stark Cty., Inc. v. Sibel*, 5th Dist. Stark No. 2009CA00065, 2010-Ohio-890, ¶ 21; *George v. Fannin*, 67 Ohio App.3d 703, 709 (12th Dist.1990); *Konicki v. Salvaco, Inc.*, 16 Ohio App.3d 40, 42 (2d Dist.1984).

{¶56} "Under this highly deferential standard of review, a reviewing court does not decide whether it would have come to the same conclusion as the trial court. Rather, we are required to uphold the judgment so long as the record, as a whole, contains some evidence from which the trier of fact could have reached its ultimate conclusions." *Hooten Equip. Co. v. Trimat, Inc.*, 4th Dist. Gallia No.

---

[5] In its brief, Appellants contend that we should conduct a de novo review as the appeal is based upon a question of law. However, Appellants fail to state how the trial court misapplied the law. Instead, Appellants argue that there is a lack of evidence upon which the court could base its finding. This does not attack the law, but the facts in this case.

03CA16, 2004-Ohio-1128, ¶ 7. We defer to the findings of the trial court because in a bench trial, it is the judge that "is best able to view the witnesses and observe their demeanor, gestures and voice infections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶57} On appeal, the parties do not dispute that the merits of this assignment of error is governed by R.C. 1302.01 et seq., "Ohio's codification of the U.C.C. for the sale of goods." *Findlay Machine & Tool*, ¶ 30. Nor do the parties dispute that the EDI Unit did not perform as it was guaranteed to in the written proposal, thus breaching the terms of their contract. Rather, the resolution to this assignment of error centers on whether American Trim ever accepted the EDI Unit as a nonconforming good by failing to properly reject the EDI Unit, as required by R.C. 1302.61.

{¶58} Under R.C. 1302.64, an acceptance of goods occurs when the buyer:

(1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(2) fails to make an effective rejection * * *; but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Further, a "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller." R.C. 1302.61.

{¶59} The EDI Unit was delivered to American Trim in November 2010. However, L&T was not able to send someone out to American Trim to set up the machine, as guaranteed in the contract, until January of 2011. There were many problems during the startup of the EDI Unit, which further delayed the installation of the EDI Unit. Additionally, once L&T was able to get the EDI Unit running, American Trim was told that it would have to gradually ramp up the machine until it would be able to run at its full capacity. Thus, the EDI Unit was not running at its full capacity until late January or early February of 2011.

{¶60} It is uncontested that once the EDI Unit started running, it never produced the results that L&T guaranteed in its contract and that American Trim immediately started to complain to L&T and Belmont. This was evidenced by an email that Art wrote to Belmont, asking whether any solutions existed or whether American Trim was better off sending the EDI Unit back to L&T. Art also told Belmont that he and other representatives of American Trim were talking about sending the EDI Unit back to L&T.

{¶61} Belmont wrote Art back on February 9, 2011, proposing a solution to the problem with the EDI Unit. Belmont offered to add two extra cells to the EDI

Unit; however, that solution would cost American Trim an additional $145,000. Understandably, American Trim was suspicious of this solution, as L&T's first cell provided dismal results. Throughout February and March, American Trim and L&T had numerous conference calls in an attempt to get the EDI Unit to start working properly. L&T offered two more solutions, both of which were not feasible or ideal for American Trim. Art testified that he asked Belmont for American Trim's money back during the conference calls; however, Belmont refused to refund any portion of the purchase price. Art testified:

Q: Is there any question in your mind that Mr. Belmont knew that you weren't satisfied with the machine and you wanted to give it back to him and you wanted your money back?

A: He definitely knew.

* * *

Q: But is there any doubt in your mind that you made it clear to Mr. Belmont you wanted your money back and he could have his machine back?

A: Yes.

Q: You believe you made that clear to him?

A: Yes.

Trial Tr., p. 81-82.

{¶62} Art stated that American Trim stopped using the EDI Unit in early March 2011. Since Belmont would not refund American Trim's money,

American Trim dissembled the EDI Unit and kept it in storage. Further, Art stated that American Trim never paid the final 10% of the purchase price.

{¶63} We find that the record contains competent, credible evidence to support the trial court's finding that American Trim rejected the EDI Unit "within a reasonable period of time after its delivery and within a reasonable period of time after [L&T's] failed attempts to rectify the problems * * *." (Docket No. 131, p. 2). L&T was unable to offer any reasonable solution to fix the EDI Unit and Art testified that he rejected the EDI Unit in phone calls to Belmont. Therefore, we find that the trial court did not err in finding that American Trim rejected the EDI Unit and that it is entitled to $98,500 in damages.

{¶64} Accordingly, we overrule L&T's and Belmont's first assignment of error.

*Assignment of Error No. II*

{¶65} In their second assignment of error, L&T and Belmont argue that the trial court erred in finding that Belmont engaged in fraudulent conduct. We agree.

{¶66} "A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 502 (1998). The fraud must not relate " 'to the nature or purport of the [contract], but to the facts inducing its execution * * *.' " *Id.*, quoting *Haller v. Borror Corp.*, 50 Ohio St.3d 10, 14 (1990). Thus, in order to

prove fraud in the inducement, it is the plaintiff's burden to establish that the defendant "made a knowing, material misrepresentation with the intent of inducing the plaintiff's reliance, and that the plaintiff relied upon that misrepresentation to her detriment." *ABM Farms* at 502, citing *Beer v. Griffith*, 61 Ohio St.2d 119, 123 (1980).

{¶67} Further, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Civ.R. 9(B). There are three reasons used to justify the particularity requirement mandated by Civ.R. 9(B):

> First, particularity is required to protect defendants from potential harm to their reputations which may attend general accusations of acts involving moral turpitude. Second, particularity ensures that the obligations are concrete and specific so as to provide defendants notice of what conduct is being challenged. Finally, the particularity requirement inhibits the filing of complaints as a pretext for discovery of unknown wrongs. The Supreme Court of Ohio has held that the first and second reasons are of paramount importance for purposes of Civ.R. 9(B).

(Citations omitted.) *Korodi v. Minot*, 40 Ohio App.3d 1, 4 (10th Dist.1987).

{¶68} Courts in Ohio have looked to federal courts for guidance on how to interpret Civ.R. 9(B). The Second Circuit has stated that the particularity requirement found in Fed.R.Civ.P. 9(B) mandates: "(1) plaintiff must specify the statements claimed to be false; (2) the complaint must state the time and place where statements were made; and (3) plaintiff must identify the defendant claimed

to have made the statement." *Korodi* at 4, citing *Goldman v. Belden*, 754 F.2d 1059, 1069-1070 (2d Cir.1985). However, this particularity requirement must also be read in conjunction with Civ.R. 8, which requires the parties' pleadings to be brief and succinct.

{¶69} In American Trim's Amended Complaint it alleged that it "purchased [the EDI Unit] based on the representation of Defendant Thomas V. Belmont, Sr. that his company was proficient in producing the nickel recovery system which he designed and installed."[6] (Docket No. 52, p. 3). However, in a set of interrogatories answered seven months later, American Trim specified five different fraudulent misrepresentations allegedly made by Belmont. The trial court's judgment entry did not find Belmont made any fraudulent statements that were alleged in the answers to L&T's interrogatories. Instead, the trial court found that Belmont's fraudulent statements concerned his "knowledge and expertise" of nickel recovery systems, as originally alleged by American Trim. (Docket No. 131, p. 2).

{¶70} Initially, we must note that American Trim's Amended Complaint and its answers to L&T's interrogatories are irreconcilable. The Amended

---

[6] L&T never raises in a separate assignment of error, nor argues in its brief, that the trial court erred in denying its Motion to Dismiss for failing to satisfy the particularity requirements of Civ.R. 9(B). However, after reviewing the record, we find it troubling that the trial court did not grant L&T's motion for a more definite statement or its motion to dismiss the fraud claim. It appears that American Trim's Amended Complaint falls short of satisfying the particularity requirement that is mandated by Civ.R. 9(B). American Trim generally states that Belmont made a representation that he was "proficient in producing the nickel recovery system" but fails to provide a date or time when this alleged statement occurred. However, since L&T does not raise this in its own separate assignment of error, we decline to address the issue any further.

Complaint alleged a general fraudulent statement concerning Belmont's expertise. However, when asked for a more specific explanation of Belmont's alleged fraudulent conduct, American Trim specified a completely different allegation of fraud regarding statements Belmont made in his written proposal, and completely ignored its initial allegation of fraud it made in its Amended Complaint.

{¶71} Even more inexplicable, when hearing L&T's and Belmont's Civ.R. 41(B)(2) motion, the trial court asked American Trim, again, what specific fraudulent statement Belmont made, American Trim responded with a different statement that was never pleaded in its Amended Complaint or disclosed in its answers to L&T's interrogatories:

> Trial Court: Okay, I need to know specifically, what was the specific misrepresentation that was relied upon?
>
> A: Specific misrepresentation that was relied upon is one, "I know how to build nickel recovery units." *Two, "This EDI Unit will recover nickel for you of one point eight seven (1.87) to two point four three (2.43) pounds per hour."* * * * [I]n [Belmont's] testimony he admits, "Well, yeah, Dan Bailey said it'll get one-third to half a pound per hour." And that's off of the, - what was known, what was represented to them it could recover.

Trial Tr., p. 137.

{¶72} American Trim's failure to specify, with particularity, its allegation of fraud in its Amended Complaint denied L&T and Belmont proper notice of what specific statement was being challenged as fraudulent. Situations like the

one we find here in this matter are the very situations which Civ.R. 9(B) was designed to prevent.

**{¶73}** The trial court only made a finding as to Belmont's fraudulent statements concerning his knowledge and expertise of nickel recovery systems; however, after a review of the record, we cannot find any competent, credible evidence in the record to support this finding or any finding of fraud.

*Fraudulent Statements Alleged in Amended Complaint*

**{¶74}** In its Amended Complaint, American Trim alleged that Belmont made the representation that L&T "was proficient in producing the nickel recovery system which he designed and installed." (Docket No. 52, p. 3). However, Art only testified that in "verbal discussions" with Belmont, Belmont "basically expressed that he was very familiar with the resin base as well as the reverse osmosis. He's done desalinization of water so there's a lot of water purification he's been involved with." Trial Tr., p. 31. Further, Motter testified that the only representation made by Belmont was that he had "[d]ifferent experience with different precious metals. That was about it really." *Id*. at p. 109. Neither Art nor Motter ever testified that Belmont made a representation to either of them that he was proficient with *nickel* recovery systems.

**{¶75}** There was no evidence produced at trial that Belmont was, indeed, not proficient with the resin base systems as well as reverse osmosis systems or

that he was unfamiliar with the process of desalinization. To the contrary, Belmont testified that he has designed and installed reverse osmosis systems before and that L&T is involved with many water desalinization projects. Belmont Dep., p. 88. Further, Belmont stated that he has designed many iron exchange systems in his career. But when asked whether he ever represented to American Trim whether L&T was proficient in producing nickel recovery systems, Belmont replied in the negative.

{¶76} Belmont denied making any statements regarding his expertise in *nickel* recovery systems, and Art and Motter both failed to testify that Belmont represented to either of them that he was proficient in *nickel* recovery systems. Therefore, we cannot find any competent, credible evidence which would demonstrate that Belmont made fraudulent statements to American Trim concerning his experience in designing and building nickel recovery systems.

*Fraudulent Statements Alleged in Answer to Interrogatories*

{¶77} In its answer to L&T's interrogatories asking for the specific fraudulent statements Belmont made, American Trim outlined five different statements that it alleged were fraudulent. Two of these statements were made after American Trim entered into the contract with L&T. Thus, there is no conceivable way these two statements induced American Trim to enter into a contract with L&T, since American Trim was *already in* a contract with L&T.

{¶78} The three remaining statements that American Trim claims were fraudulent were that:

[1] The most cost effective and efficient system that meets the water quality for R1 water recycle and nickel concentration for reclaim back to process, is electro dialysis through an LTED-40 System.

[2] A complete operation and maintenance manuals [sic] will be provided on CD and the manual shall include but not be limited to, installing, detail schematics, Manufacturer's literature, sequence of operations and of the complete LTED Tech Inc. system catered to the custom design of the system.

[3] LT Technologies, Inc., a global firm is uniquely qualified in the marketplace as a design build firm, by offering a total dedicated engineering and manufacturing dynamic to each project we undertake. By employing this dedicated approach, LT technologies consistently meets or exceeds budget and timeline goals, which in turn, ensures our clients meet their responsibilities for compliance and /or production. The Core strategy of design build is what stands LT apart from firms that do either engineering, or experimental design analysis, as well as real time data gathering being turned into production improvements. The result is a robust, industrial grade system with the people and the firm to stand behind it. Superior quality is not our goal it is our standard.

(Docket No. 140, Defendant's Exhibit A, p. 2).

{¶79} As to the first statement, American Trim never provided any evidence that Belmont knew that the EDI Unit would not be cost effective and efficient for American Trim's purposes when he made that representation to American Trim. To the contrary, Belmont testified that it was his belief that an EDI system was, indeed, a cost effective and efficient system to use for nickel recovery. Belmont talked to Bailey, who American Trim acknowledges is one of

the leading experts in EDI systems, and asked for his advice before recommending the EDI Unit to American Trim. Belmont also testified that it was his belief that an EDI Unit was capable of recovering 1.87 to 2.43 pounds of nickel per hour. He based that belief on Bailey's advice and on the "data that Aaron Art sent[.]" Belmont Dep., p. 50. Belmont elaborated on his discussion with Bailey:

A: I described to [Bailey] the operation at American Trim.

Q: Okay.

A: And that it's a lot of nickel, they have a lot of nickel drag-out because of the types of parts they do.

Q: Right.

A: And so I asked him, what do you think about the EDI process that you people have?

Q: Um-hum.

A: Would it work? He says, yeah, it's an excellent way to do it, he said; because, he said, we have them at General Electric, Westinghouse, places like that who use them. And he said, you just, the higher the concentration, he said, the faster it works.

*Id.* at p. 30.

{¶80} Belmont was told, by an expert in the field, that the EDI process would be an "excellent" option for American Trim, and that other major companies, such as General Electric and Westinghouse, use the EDI process. Without any evidence proving otherwise, it appears that Belmont had every reason to believe that the EDI Unit would be cost effective and efficient for American

Trim. We fail to see how Belmont made a knowing misrepresentation to American Trim.

{¶81} Regarding the second statement, it relates to the terms of the contract and is therefore, not fraudulent. In addition to the EDI Unit, Belmont was also required to provide an operation and maintenance manual. Art testified that L&T provided an operation and maintenance manual, although it was generic and unhelpful. However, "[a] classic claim of fraudulent inducement asserts that a misrepresentation of facts *outside the contract* or other wrongful conduct induced a party to enter into the contract." (Emphasis added.) *Haller*, 50 Ohio St.3d at 14. We fail to see how the promise of an operation manual was somehow outside of the contract and induced American Trim to enter into the contract with L&T. The fact that Belmont provided an insufficient operation manual to American Trim gives rise to a breach of contract claim, not to a fraud in the inducement claim.

{¶82} Finally, the third statement was mere puffery, a fact that both the trial court and American Trim's counsel seemed to acknowledge during the arguments for L&T's and Belmont's Civ.R. 41(B)(2) motion:

> Trial Court: Now the rest of the stuff about global world leader, blah, blah, blah, isn't that just permitted puffery?
>
> A: I wouldn't, - the answer, -
>
> Trial Court: I mean, you understand the difference between, -
>
> A: I do.

Trial Court: --, a specific representation and, "Oh, I'm the best"?

A: I do, and you're absolutely right, Your Honor.

Trial Tr., p. 135-136.

{¶83} We are unable to find any fraudulent statements that were made by Belmont. Thus, the trial court abused its discretion in finding that Belmont made fraudulent representations to American Trim, which induced it into entering into a contract with L&T. It was also an abuse of discretion to base a finding of fraud on matters that were not pled with particularity by American Trim.

{¶84} Accordingly, L&T's and Belmont's second assignment of error is sustained.

{¶85} Having found no error prejudicial to L&T and Belmont in the first assignment of error, but having found error prejudicial to L&T and Belmont in the second assignment of error, we affirm in part and reverse in part the trial court's judgment and remand this matter for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part, and*
*Cause Remanded*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**